UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY TOMMASETTI,                )   No. CV 04-9812-PJW
                                   )
            Plaintiff,             )
                                   )
      v.                           )   MEMORANDUM OPINION AND ORDER
                                   )
JO ANNE B. BARNHART, Commissioner  )
of the Social Security            )
Administration,                    )
                                   )
            Defendant.             )
_____  )

I.

INTRODUCTION

     Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the decision by Defendant Social Security Administration ("Agency") denying Period of Disability ("POD") and Disability Insurance Benefits ("DIB"). Alternatively, he asks the Court to remand the case to the Agency for further proceedings. For the reasons discussed below, the decision of the Agency is AFFIRMED, and this action is DISMISSED WITH PREJUDICE.

II.

BACKGROUND

Plaintiff was born on September 1, 1940, and was 62 years-old at the time of the relevant administrative hearing.  (AR 79, 222.)  He has a high school education plus one year of trade-school.  (AR 74-75, 108.)  Plaintiff has past relevant work experience as an electronics assembler, television repairman, and television antenna installer. (AR 100-02, 108.)

Plaintiff filed protectively for DIB and POD benefits on June 1, 1995.  (AR 79-82.)  He alleged that he suffered from disabling pain since May 6, 1994, when his back was injured in a series of accidents. (AR 45, 79, 104, 112.)  He timely requested a hearing before an administrative law judge ("ALJ") after his claim was denied initially and on reconsideration.  (*See* AR 85-93.)

In an administrative odyssey spiced with allegations of duress and lost hearing tapes, Plaintiff's case has been up and down the Agency for the past 11 years.  Between them, two different ALJs held a total of three hearings on Plaintiff's application.  Although only the decision that followed the ultimate hearing is at issue in this case, the substance of each hearing and the evidence introduced at each is relevant because of the nature of Plaintiff's claims.  Accordingly, the Court will summarize the hearings in chronological order.

A.   The First Hearing (February 12, 1997)

The first hearing was held on February 12, 1997.  (AR 55-78.) Plaintiff appeared with counsel and testified.  (AR 56.)  No other witnesses appeared.

Plaintiff testified that he is a resident alien.  (AR 65.)  He stated that he felt unable to work because of a back injury, which

2

1  caused him pain and left him unable to bend over.  (AR 57-58.)  He
2  also testified that he is a diabetic, but admitted that, when he takes
3  his insulin, his diabetes is under control.  (AR 58-59.)  Finally,
4  Plaintiff complained of a then-recent heart attack that he had
5  suffered in December 1996 while visiting his sister in Venezuela.  (AR
6  59-62.)

7      As to his medical treatment, Plaintiff testified that he saw a
8  doctor every two to four weeks to monitor his blood sugar and his back
9  pain.  (*See* AR 66-67.)  He stated that he took insulin for his
10 diabetes, and Disalcid for his back pain.  (AR 69-70.)  Plaintiff
11 added, however, that he experienced dizziness and drowsiness when he
12 took his pain medication.  (AR 70.)

13     Regarding his daily activities, Plaintiff claimed that he no
14 longer performed any cleaning, yard-work, cooking, or did any laundry
15 around the house, although he admitted that he did some light grocery
16 shopping.  (AR 64-65.)  He testified that he passed the time on an
17 average day watching television, reading, walking, sitting around, and
18 talking on the telephone.  (AR 65.)  On his doctor's instruction,
19 Plaintiff stated that he walked "at least one block" every morning.
20 (AR 65.)  Although Plaintiff admitted that he went out to eat
21 occasionally and that he still drove his car, he denied having been to
22 a movie in three years.  (AR 65, 70.)  After noting that Plaintiff's
23 testimony was in some respects inconsistent with the written record,
24 (*see* AR 70-75), the ALJ adjourned the hearing.  (AR 76-78.)

25     On September 27, 1997, after analyzing Plaintiff's claims under
26 the Agency's five-step sequential evaluation process, the ALJ issued a
27 decision.  (AR 44-47.)  After reviewing the medical record and
28 dismissing some of Plaintiff's subjective symptom complaints as not

3

credible, the ALJ determined that Plaintiff retained sufficient residual functional capacity to perform a range of light and medium work.  (*See* AR 45-46.)  Because Plaintiff's previous job as an electronic technician was light work, the ALJ concluded that he was not disabled as defined in the Social Security Act (the "Act") at any time through the date of the decision.  (AR 46-47.)

Plaintiff timely requested review of the decision.  (AR  10.) The Appeals Council denied review.  (*See* AR 8-9.)  Plaintiff filed a complaint in this Court on January 14, 1999.  (AR 265.)  The Court found that the ALJ's adverse credibility determination and his residual functional capacity assessments were not supported by substantial evidence, and remanded the matter to the Agency for further proceedings.  (*See* AR 270-72.)

B.   The Second Hearing (July 25, 2000)

The second hearing was held before the same ALJ on July 25, 2000. (Supp. AR 530-33.)[1]  Once again, Plaintiff appeared with counsel and testified; no other witnesses appeared.  (Supp. AR 532-33.)  At that hearing, Plaintiff's counsel stated that, "based on [the] pre-hearing discussion," Plaintiff wished to move to "amend his onset date to September 1, 1998."  (Supp. AR 532.)  When asked whether he agreed to amend his onset date, Plaintiff stated: "Well, I have no choice.  Yes. I agree."  (Supp. AR 532.)  Because counsel had nothing further, the ALJ adjourned the hearing.  (*See* Supp. AR 533.)

On September 20, 2000, the ALJ issued his second decision, analyzing Plaintiff's claims under the Agency's five-step sequential

_____

[1]   The "Supp. AR" shall refer to the Supplemental Administrative Record that Defendant filed with the Court on November 2, 2005.

4

1   evaluation process.   (*See* AR 349-55.)   After noting that the record

2   had been expanded to include "consultative orthopedic and

3   cardiovascular examinations" pursuant to the court-ordered remand, and

4   emphasizing that Plaintiff's alleged onset date had been amended to

5   September 1, 1998, (*see* AR 351-52), the ALJ concluded that he was

6   entitled to DIB and POD benefits "commencing on that date, but not

7   prior thereto."   (AR 352.)

8        Plaintiff, through counsel, once more timely sought review of the

9   ALJ's second decision.   (*See* AR 356-59.)   Through his new counsel,

10   Plaintiff stated his dissatisfaction with the second decision:

11        The basis for the exceptions is judicial misconduct.   At the

12        administrative proceedings conducted [at the second

13        hearing], ALJ Wheeler gave [Plaintiff] an ultimatum

14        regarding his claim for benefits.   ALJ Wheeler stated that

15        either [Plaintiff] accept a later onset date of disability,

16        specifically an onset date of September 1, 1998, or the ALJ

17        would or could deny the entire claim.   [Plaintiff] inquired

18        regarding his benefit rate in consideration of the half loaf

19        or no loaf offer.   ALJ Wheeler refused to run an earnings

20        inquiry.   ALJ Wheeler refused to allow [Plaintiff] any

21        additional time in which to consider the matter.   Based upon

22        that posture of the case, and based upon the threat of an

23        outright denial if the later onset date were not "accepted"

24        [Plaintiff] accepted the offer under duress.

25   (AR 356.)   After questioning the ethical propriety of permitting an

26   ALJ to act as a "settlement officer," (*see* AR 357), he argued that, by

27   coercing an amended onset date off-the-record, the ALJ effectively

28   created an unreviewable period between the original and amended onset

5

1   dates.  (*See* AR 358-59.)  Plaintiff urged the Appeals Council to
2   remand the matter, and suggested that the Agency adopt a rule
3   requiring ALJs who wish to "'suggest' an amendment to an onset date of
4   disability" at the hearing do so on the record and without any threat.
5   (AR 359.)

6        On November 18, 2002, the Appeals Council noted that the tape
7   recording of the second hearing had been "certified as lost."  (AR
8   366.)  Because the loss of that tape meant that the Appeals Council
9   was "unable to fully evaluate the exceptions," it remanded the matter
10  to a new ALJ.  (AR 366.)  The Appeals Council specifically stated:

11       The [ALJ] will afford [Plaintiff] an opportunity for a
12       hearing.  As appropriate, he will obtain updated medical
13       information from any treating sources, as well as one or
14       more consultative examinations regarding [Plaintiff's]
15       condition.  The [ALJ] will then consider the entire record,
16       and will provide discussion and evaluation for the
17       conclusions reached concerning the specific limitations
18       resulting from [Plaintiff's] impairments [. . . .]  The
19       credibility of [Plaintiff's] subjective complaints will be
20       addressed [. . . .]  Further, the [ALJ] will provide
21       rationale as to the weight that he assigns to the medical
22       assessments and opinions of record [. . . .]

23  (*See* AR 366 (citations omitted).)  The Appeals Council explained that
24  these measures would enable the new ALJ to comply with this Court's
25  previous remand instructions: namely, that he assess "[Plaintiff's]
26  credibility and residual functional capacity for the entire period at
27  issue."  (*See* AR 366.)

28

C.    <u>The Third Hearing (August 4, 2003)</u>

    Thereafter, a new ALJ held a hearing on August 4, 2003.  (AR 222-62.)  Once more, Plaintiff appeared with counsel and testified.  (AR 229-30, 237-51, 253-56.)  The ALJ also took the testimony of Dr. Daniel Wiseman, a medical expert.  (AR 228-37.)  Finally, the ALJ heard the testimony of Mr. Gregory Jones, a vocational expert.  (AR 250-62.)

    Plaintiff testified his low back pain and diabetes had prevented him from working since 1994.  (AR 237.)  Although Plaintiff appeared at the hearing using a cane, which he claimed to have used since 1995, he professed to be unable to remember whether his doctor had prescribed it.  (AR 240, 244-45.)  He stated that his doctor had prescribed some anti-inflammatory medications in 1995, but stated that this prescription was discontinued when he reported that they caused side-effects of dizziness and drowsiness.  (AR 243-44.)  Plaintiff added that his treating physician "wanted to operate" on his back; evidently, Plaintiff refused because his doctor could not "guarantee" that this would alleviate his pain.  (AR 240.)

    Regarding his ailments, Plaintiff admitted that his diabetes had been mostly under control during the relevant period, (*see* AR 238-40), he added that it took his doctors time to find the right dosage of insulin for him, and speculated that his diabetes had caused him periodic bouts of dizziness.  (AR 243-44, 248-49.)  He felt that the back injury he sustained after his 1994 accident had left him totally unable to work because he could no longer stand, walk, or climb ladders.  (*See* AR 237, 245.)  He was certain that he could not spend a half day on his feet, although he thought that he could have stood for two hours at a time before needing to alternate positions.  (AR 237-

7

1  38, 253.)  He also estimated that he would have been able to lift a
2  gallon of water, at most, after his accident.  (AR 240-43.)  Plaintiff
3  stated that due to these limitations he did not try to resume work as
4  a television repairman because that job would have required him to
5  lift televisions.  (AR 247.)  He admitted that he did not try to do
6  any other kinds of jobs since his accident.  (AR 245, 248.)

7      Dr. Wiseman next testified about Plaintiff's medical impairments.
8  He characterized Plaintiff's back ailment as chronic low back pain,
9  and noted that--although some doctors had recommended surgery--
10 Plaintiff had "done a number of things to try to avoid that," with
11 evident success.  (*See* AR 230.)  He noted that the record showed that
12 Plaintiff has scoliosis of the spine, but hastened to add that there
13 was no clinical evidence of any impingement of the spine.  (*See* AR
14 231.)  Although he testified that "low back pain doesn't have to have
15 any radiographic abnormalities," the medical expert stated that such
16 pain "can be quite uncomfortable to the point that it causes a person
17 to choose a lifestyle away from working."  (AR 233.)  Dr. Wiseman
18 opined that Plaintiff's ailments did not meet or equal a Listing.
19 (*See* AR 233-34.)  When asked to resolve the conflicts in the medical
20 record, this doctor acknowledged that at least one of Plaintiff's
21 treating physicians had opined that he could not work a full day, (AR
22 233-34), and felt that he could not say otherwise "not having been the
23 person who saw him at the time," (AR 234), but emphasized that "people
24 with the anatomic and physical findings that [Plaintiff] presents have
25 been known to do a lot more."  (*See* AR 235-36.)  He concluded that
26 Plaintiff's physical findings, x-rays, and treatment regimen had not
27 changed since his injury in 1994.  (AR 236.)

28

1    Finally, the ALJ heard from Gregory Jones, the vocational expert.
2  Mr. Jones characterized Plaintiff's prior work as electronic assembly.
3  (AR 250-52.)   The ALJ then posed a hypothetical question:

4        [Assume] a hypothetical individual of this gentleman's age,
5        education and past work history, and for the first
6        hypothetical let's say he can perform work lifting up to ten
7        pounds, stand six hours [in two hour increments], [and] sit
8        six hours.

9  (See AR 253.)   The expert opined that this hypothetical person could
10 perform Plaintiff's past work as an electronics assembler, a job
11 typically performed at the sedentary level.   (See AR 253-61.)   In
12 addition, Mr. Jones testified that this person could perform the work
13 of a semiconductor assembler, a sedentary position for which there
14 were approximately 9000 jobs in the local economy.   (AR 256-57.)

15    On September 26, 2003, the ALJ rendered her decision.   (AR 208-
16 21.)   At the outset, after noting that the Appeals Council's remand
17 instructions left her "obligated to make a de novo decision," the ALJ
18 observed that Plaintiff "must establish disability by December 31,
19 1999" to qualify for DIB or POD benefits.   (AR 212.)   With that
20 framework in mind, the ALJ made the step-one determination that
21 Plaintiff had not engaged in gainful activity since May 6, 1994.   (AR
22 212.)

23    Accordingly, the ALJ proceeded to steps two and three, where she
24 found that, although Plaintiff "satisfied the de minimis step of
25 having a severe impairment," he lacked neurological or physical
26 abnormalities sufficient to satisfy the listings for musculoskeletal
27 defects or diabetes.   (AR 212.)   At step three, the ALJ specifically
28 stated that she "concur[red] with Dr. Wiseman."   (AR 212.)

Next, the ALJ assessed Plaintiff's residual functional capacity. (*See* AR 213.)  Ultimately, the ALJ determined that "[Plaintiff] was capable of lifting as much as 10 pounds, standing or walking for six hours in an eight hour workday, at two hour increments, and sitting for six hours in an eight-hour workday."  (AR 213.)  The ALJ reached this conclusion "based on the composite medical and lay evidence," (AR 213), and after finding that Plaintiff's subjective symptom testimony was less than fully credible.  (*See* AR 214-15.)

The ALJ then engaged in a thorough discussion of her analysis at steps four and step five of the sequential process.  (*See* AR 218-20.) At step four, the ALJ concluded that Plaintiff could perform his past relevant work as an electronics assembler as that job was typically performed, i.e., sedentarily.  (*See* AR 218-19.)  Alternatively, the ALJ concluded that Plaintiff could perform other work as a sedentary semi-conductor assembler.  (AR 219-20.)  Accordingly, she concluded that Plaintiff was not disabled at any time through December 1999. (*See* AR 220.)

Plaintiff sought review of the third decision, arguing that the Appeals Council's previous remand instructions had led to the "absurd result of having this matter sent back for a *de novo* proceeding instead of a determination as to the onset of disability," with the consequence that the Agency had rescinded in the third decision benefits that it had granted in the second decision.  (*See* AR 185.) On October 20, 2004, however, the Appeals Council denied review.  (AR 179-82.)  The decision of the ALJ became the final decision of the Agency, and Plaintiff then filed her Complaint in this Court.  The parties filed a Joint Stipulation ("Joint Stip.") on April 4, 2006.

10

III.

STANDARD OF REVIEW

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn an ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).) It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). Indeed, if the record evidence reasonably can support either affirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the ALJ committed error but the error was harmless, reversal is not required. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2003)(applying the harmless error standard).

11

1

IV.

2

DISCUSSION

3       Plaintiff argues that the ALJ made three errors.  He claims that

4  the ALJ did not articulate clear and convincing reasons to support his

5  adverse credibility determination.  (*See* Joint Stip. at 20-24, 27-29.)

6  Plaintiff also contends that the ALJ did not give sufficiently

7  specific and legitimate reasons for rejecting the opinions of his

8  treating physician.  (*See* Joint Stip. at 4-11, 18-20.)  Finally,

9  Plaintiff disagrees with the ALJ's finding that he was able to return

10 to his former job.  (*See* Joint Stip. at 30-32, 35-37.)

11      Underlying all of Plaintiff's claims is the notion that, in

12 remanding the matter to a new ALJ for a third hearing, the Appeals

13 Council somehow robbed him of the previous ALJ's determination that he

14 was disabled as of September 1, 1998; he repeatedly requests

15 reinstatement of that decision as one of his remedies.  (*See* Joint

16 Stip. at 11, 20, 37.)  The Court must dispense with this contention at

17 the outset.  The decision of an ALJ only is binding if neither party

18 requests review of the decision.  *See* 20 C.F.R. § 404.955(a).  Here,

19 at Plaintiff's request, the Appeals Council granted review and sent

20 the matter back to a new ALJ.  (*See* AR 356-62.)  Although the Appeals

21 Council did not specifically state that it was vacating the second

22 decision, even a cursory perusal of its remand instructions leave no

23 doubt that this is what was intended.  (*See* AR 362 (noting that the

24 Appeals Council was remanding "*the entire matter*" to a new ALJ, who

25 would be required to assess "the claimant's credibility and residual

26 functional capacity for *the entire period at issue*")(emphases added).)

27 Plaintiff's counsel accepted these remand instructions, and did not

28 ask the Appeals Council to narrow those instructions in a way that

12

1  would permit the ALJ to review only the unfavorable portion of the

2  prior decision. (*See* AR 363.) All of this being so, Plaintiff can

3  not complain that he lost the benefit of a second, partially-favorable

4  decision that he himself challenged. *See Lombardo v. Schweiker*, 749

5  F.2d 565, 567 (9th Cir. 1984).

6       Having addressed this preliminary matter, the Court will reach

7  each of the issues Plaintiff has raised, albeit in a sequence slightly

8  different from the order in which he has briefed them. As will be

9  explained below, the record supports the ALJ's adverse credibility

10 finding. Additionally, the ALJ's evaluation of the medical evidence

11 was proper. Finally, the ALJ's assessment of Plaintiff's residual

12 functional capacity supported his conclusion that Plaintiff could

13 engage in substantially gainful activity--if not at his prior job,

14 then at another job. For all of these reasons, the Court concludes

15 that substantial evidence supports the ALJ's finding of non-

16 disability.

17 A.   <u>The Adverse Credibility Determination</u>

18      Because Plaintiff's claimed disability--back pain accompanied by

19 relatively sparse clinical evidence--turns on how believable his

20 testimony was, the cornerstone of the ALJ's decision is her

21 determination that Plaintiff's testimony was not credible. (*See* AR

22 220.) Recognizing the importance of this finding, Plaintiff

23 challenges it. (*See* Joint Stip. at 20-24, 27-29.) After reviewing

24 the record, the Court concludes that the ALJ offered sufficiently

25 clear and convincing reasons to support her conclusion that

26 Plaintiff's testimony was not credible.

27      "Credibility determinations are the province of the ALJ." *Fair*

28 *v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). An ALJ may reject a

claimant's testimony as not credible by specifically identifying the
incredible testimony and by identifying the evidence that undermines
that testimony.  *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.
1996).  As long as substantial evidence in the record supports the
ALJ's credibility finding, this Court may not second-guess it.  *See
Morgan*, 169 F.3d at 600.  The Court will not reverse an ALJ's
credibility determination based on contradictory or ambiguous
evidence.  *See Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

The Ninth Circuit recognizes that pain testimony is difficult to
weigh because "pain is a highly idiosyncratic phenomenon, varying
according to the pain threshold and stamina of the individual victim."
*Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986).  More
expansively, the circuit has observed:

> Unlike most medical conditions capable of supporting a
> finding of disability, pain cannot be objectively verified
> or measured . . . .  [T]he very existence of pain is a
> completely subjective phenomenon.  So is the degree of pain:
> The amount of pain caused by a given physical impairment can
> vary greatly from individual to individual.

*Fair*, 885 F.2d at 601.

The inherent difficulty in evaluating another person's experience
of subjective symptoms has prompted the Ninth Circuit to require the
ALJ to undertake a two-step analysis when considering a claimant's
symptom testimony.  First, the ALJ must examine the evidence to
determine whether the claimant has met his burden of producing
objective medical evidence of an impairment, *and* of showing that the
impairment reasonably could be expected to produce a symptom.  *See
Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  In

Plaintiff's case, although the ALJ noted that the testifying medical expert "questioned whether [Plaintiff] even had a medical foundation for his alleged back pain," she ultimately "g[ave] [Plaintiff] the benefit of the doubt in finding that he has a verifiable impairment that could cause the symptoms alleged." (AR 214.) Thus, the ALJ satisfied the first *Smolen* step.

The second step requires the ALJ to assess the claimant's credibility as to the severity of her pain or other subjective symptoms. *See Smolen*, 80 F.3d at 1282. Although the claimant must produce medical evidence of an underlying impairment reasonably likely to be the *cause* of his alleged symptom, he is not required to submit medical findings to substantiate the *severity* of his symptoms. *See Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992). Thus, the ALJ may not reject the claimant's subjective complaints regarding the extent and severity of his symptoms merely because it cannot be supported by objective medical evidence. *See Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991)(*en banc*)(citation omitted). Rather, a claimant's testimony concerning the severity of her pain or other symptoms can only be rejected for specific, clear, and convincing reasons. *See Drouin*, 966 F.2d at 1258; *see also Lester*, 81 F.3d at 834 ("For the ALJ to reject the claimant's complaints, [the ALJ] must provide specific, cogent reasons for the disbelief.")(internal quotation marks and citation omitted).

In Plaintiff's case, the ALJ marshaled an abundance of evidence to support her adverse credibility finding. Generally, she accepted Dr. Wiseman's testimony that Plaintiff did not appear especially motivated to work. (*See* AR 214 (noting that Dr. Wiseman "reiterat[ed] the theme that [Plaintiff] had elected to limit himself").) The ALJ

1   also gave more specific reasons for rejecting Plaintiff's claim to
2   have "had a disabling frequency or intensity of pain during the
3   pertinent times." (*See* AR 215.)  The ALJ elaborated:

4           [Plaintiff] did not have an aggressive treatment program.
5           He did not seek alternative medication or other avenues of
6           treatment after stopping one effective medication because of
7           side effects.  On the other hand, [Plaintiff's] statements
8           that he benefitted from physical therapy and other
9           conservative treatment suggest to the undersigned that
10          [Plaintiff's] symptoms were being ameliorated.  This is
11          seen, for example, by contemporaneous statements that he was
12          improved and that his symptoms were intermittent.  Further,
13          [Plaintiff's] testimony centered on concerns with ladder
14          climbing and other strenuous activities related to balance.
15          [His] testimony suggested his belief that he might have been
16          able to do other work.  He appeared to acknowledge that
17          diabetes was not a problem if properly controlled, and
18          specifically stated that it was not the reason that kept him
19          from working.  [Plaintiff] may not have been motivated for
20          work due to his then large financial reserve.  In any event,
21          he admitted that he did not attempt to find other work and
22          seemed to indicate that he did not try to test his
23          boundaries.  He was able to travel to Venezuela.  On
24          questioning by the undersigned, [he] was not clear or
25          certain insofar as his self-assessed work capacities.
26  (*See* AR 215 (citations and citations to record omitted).)  The ALJ
27  concluded that Plaintiff "is/was not a precise judge of his own
28  capacities."  (AR 215.)

                                    16

1    As will be explained below, this Court's review of the record
2  confirms that the ALJ's credibility finding rested on proper
3  considerations.  The Court will address each of the ALJ's
4  justifications in turn.

5    1.  <u>Conservative Treatment</u>

6    As support for her adverse credibility determination, the ALJ
7  repeatedly noted that Plaintiff received only conservative treatment
8  for his back pain.  (*See* AR 213, 215.)  Substantial evidence supports
9  the ALJ's inference that, in light of the conservative treatment
10  Plaintiff received, his back pain was not disabling.

11    A claimant's pursuit of only conservative treatment for his pain,
12  without offering any explanation for failing to seek more aggressive
13  treatment, can be considered when evaluating his credibility.  *See*
14  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *see also Burch*
15  *v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)("The ALJ is permitted
16  to consider lack of treatment in his credibility determination.")
17  Thus, where a claimant complains of disabling pain but receives
18  relatively conservative treatment for it, the ALJ may disbelieve his
19  claims about the severity of his pain.  *See Meanel v. Apfel*, 172 F.3d
20  1111, 1114 (9th Cir. 1999)(rejecting claimant's allegation "that she
21  experienced pain approaching the highest level imaginable," which was
22  "inconsistent with the minimal, conservative treatment that she
23  received")(internal quotation marks omitted).  Even where the clinical
24  evidence shows an abnormality, the fact that treating doctors find it
25  unnecessary to treat the abnormality is evidence that the ALJ may rely
26  upon in rejecting a claimant's testimony that that impairment causes
27  him disabling pain.  *See Tidwell*, 161 F.3d at 602.

28

17

For an allegedly disabling back injury, the record reflects very conservative treatment. At the outset, it bears emphasis that-- although Plaintiff claimed to have suffered a number of accidents since 1994--his treating physicians never diagnosed anything more serious than a back strain or sprain, accompanied by arthritis and degenerative disc disease. (*See* AR 141, 147, 151, 155, 398.) Pursuant to this diagnosis, Plaintiff was prescribed oral medications, chiefly Disalcid (i.e., Salsalate), as well as a TENS unit. (AR 35, 37-39, 41, 141, 151, 155.) Plaintiff also was prescribed physical therapy. (*See* AR 12-13, 24, 141.) Over the years, Plaintiff reported that Disalcid "improv[ed]" his back pain, and reported "much ↓ pain" on a half dosage. (*See* AR 147, 150.) Although Plaintiff also reported side-effects from the Disalcid, (*see* AR 12, 314, 329), he evidently continued to use it and was neither prescribed stronger medication nor more aggressive treatment. (*See* AR 35, 151, 213, 322.) Indeed, his treating physician evidently did not consider his pain or side-effects intense enough to prescribe more potent medications, other types of treatment--such as surgery--or even additional diagnostic procedures, including an MRI. (*See* AR 11-12.)

Other evidence in the record supports the ALJ's inference that Plaintiff did not seek the amount or kind of treatment that one reasonably could expect of a person suffering from disabling back pain. Even if the Court credits Plaintiff's testimony that his treating physician had urged him to undergo an operation but that he opted not to do so because there was no "guarantee" it would help

18

1    him,[2] (*see* AR 240), his comparatively aggressive response to another

2    ailment belies his suggestion that was afraid to undergo delicate

3    surgical procedures without assurances of their success.

4    Specifically, the record reflects that, by October 1994--five months

5    after he allegedly suffered his disabling back injury--Plaintiff

6    sought medical attention for a "bent penis," a condition that caused

7    him only "mild pain" when he had an erection. (*See* AR 161.)  At that

8    time, doctors recommended surgery to straighten Plaintiff's penis, but

9    informed him that there were no guarantees with that operation.  (AR

10   163 (memorializing a doctor's note that he informed Plaintiff that

11   "there is no guarantee that erectile function would improve after the

12   procedure").)  Risks notwithstanding, Plaintiff elected to have the

13   surgery, and underwent an operation requiring general anesthesia.  (AR

14   165-66.)  Two years later, Plaintiff repeatedly expressed his

15   dissatisfaction with his erection to his neurologist, and asked for a

16

17

18

19

20

21

22

23

24

25

26        [2]  Curiously, Plaintiff now asserts that "[n]o physician in the

27   record has even remotely suggested that there exists more aggressive
     [. . .] or alternate forms of treatment that could alleviate the pain

28   symptoms."  (Joint Stip. at 18.)

penile implant.[3]  (*See* AR 20, 27 (noting that Plaintiff "has to have reasonable expectations re: length/girth").)  The ALJ mentioned this evidence in her decision.  (*See* AR 215.)

Ordinarily, the Court would hesitate before concluding that evidence of a disability claimant's pursuit of sexual activity legitimately could support an adverse credibility finding.[4]  Here, however, substantial evidence shows that Plaintiff spent the better part of a decade pursuing penile implants and multiple surgeries to correct a "bent penis" during the same period that he claims to have suffered from disabling back pain.  Without in any way trivializing the discomfort or embarrassment Plaintiff may have suffered from his penile abnormality, the Court finds that--at least in this situation--

_____

[3]  Plaintiff evidently elected to have a penile implant inserted in a surgical procedure performed in 1999 or 2000.  (*See* AR 393.)  By early 2002, however, he was complaining that the implant had left him with "a short functional penile length," a problem exacerbated by the accumulation of fat in his lower abdomen.  (*See* AR 524.)  To address the problem, in November 2002, Plaintiff had a panniculectomy, which was the "surgical excision of the excess skin and the entire subdermal fat along with muscle repair of the lower abdominal wall, followed by fasciocutaneous repair of the abdominal wall."  (*See* AR 501-02.)  Finally, in 2003, Plaintiff had a fourth surgery: a 90-minute operation for the "removal and replacement of [the] penile implant," an operation requiring general anesthesia.  (*See* AR 497, 511-12.)

[4]  The Ninth Circuit has recognized that one does not need to be "utterly incapacitated" in order to be disabled.  *See Fair*, 885 F.2d at 603 (noting that a claimant is not required to be totally disabled to be eligible for benefits and that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").  And it is clear that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.  *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1997); *see also Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (noting that a disability claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits).

the principle that a claimant should not be punished for attempting to lead a normal life collides with another important legal precept developed in Social Security jurisprudence: the ALJ's prerogative to consider any inconsistency between the level of pain a claimant asserts, on the one hand, and the type of treatment he elects to pursue, on the other hand. *See Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995)(holding that an ALJ may rely upon inconsistencies to discredit a claimant's subjective symptom statements); *see also Sample v. Schweiker*, 649 F.2d 639, 642 (9th Cir. 1982)(holding that the ALJ may draw reasonable inferences logically flowing from the record). Especially when contrasted with his relatively passive attitude toward his back pain--for which he supposedly turned down even one surgical procedure--Plaintiff's aggressive approach of having four surgeries to correct a penile disorder fairly supports the inference that his back pain was less of an inconvenience to him than was his sexual dysfunction.

In sum, the most charitable interpretation of this record is that Plaintiff's priorities--in light of his claim of unremitting back pain and inability to function--are wildly misplaced.  The less charitable interpretation, and the one the ALJ drew, is that Plaintiff's failure to seek aggressive treatment for his back pain indicated that he was simply not in as much pain as he claimed.  Because this reasoning is sufficiently clear, convincing, and specific to support the ALJ's adverse credibility determination, and because it is reinforced by substantial evidence in the record, this Court will not disturb it. *See Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

1          2.   Motivation

2          The ALJ also noted that Plaintiff appeared to be unmotivated to

3    work.  (See AR 214.)  The Court finds that this was a legitimate basis

4    for the ALJ's adverse credibility determination.

5          The "ordinary techniques of credibility evaluation" should be

6    applied in disability hearings.  See Fair, 885 F.2d at 604 n.5.  These

7    include consideration of a witness' motivation.  See, e.g., 1 Devitt &

8    Blackmar, Federal Jury Practice and Instructions, § 17.01.  Thus, it

9    is well-established that the ALJ may consider a claimant's "motivation

10   to obtain social security benefits" as part of his overall credibility

11   determination.  See Matney on Behalf of Matney v. Sullivan, 981 F.2d

12   1016, 1020 (9th Cir. 1992).  Conversely, the ALJ also may consider

13   whether the claimant lacks the motivation to work.  See Osenbrock v.

14   Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001).

15         Substantial evidence supports the ALJ's conclusion that Plaintiff

16   lacked the motivation to work, and that this lassitude negatively

17   reflected on his credibility.  On this point, the testifying expert

18   explained how he interpreted Plaintiff's claimed limitations:

19         [Low back pain] can be quite uncomfortable to the point that

20         it causes a person to choose a lifestyle away from working,

21         away from doing any kind of physical exertion, whether it

22         produces income or not.  And I suggested that [that] is what

23         we see here, that this man has chosen to limit his

24         activities [and] level of physical functioning because of

25         discomfort.

26   (AR 233.)  When the ALJ requested clarification, the testifying expert

27   elaborated, stating that he read Plaintiff's treating physicians'

28

                                   22

opinions as evidencing "the way he was willing to work." (AR 234.)
Dr. Wiseman then explained Plaintiff's treating physician's assessment
of his functional limitations in the following manner:

> I believe [Plaintiff's treating physician] described four
> hours sitting and standing, two hours walking and ten pounds
> lifting frequently and infrequently. And I think that
> [that] is what [Plaintiff] has said he has chosen to do.
> That is what he is doing. That is what his doctors have
> seen him do and that's what I have to say [...] what he has
> and will do.

(AR 235-36.)   The testifying expert summarized his assessment: "I can
tell you [. . .] that people with the anatomic and physical findings
that [Plaintiff] presents have been known to do a lot more. But he's
chosen to do that." (AR 236.)

The record supports Dr. Wiseman's testimony as well as the
inference that the ALJ drew from it: i.e, that Plaintiff was
unmotivated to work. Plaintiff had been cleared to return to work by
his treating physician in May 1995. (*See* AR 150.) Only two months
later, however, Plaintiff began soliciting the opinions of a *different
physician* in support of an application for permanent disability. (*See*
AR 149.) At the third hearing, Plaintiff admitted that he "never did"
try to lift anything as heavy as two gallons of milk after his
accident in 1994. (*See* AR 241.) He testified that "people called"
him to ask him to return to his previous job, but confessed that he
told them "I'm disabled. I cannot do it. And they didn't do it
[i.e., call him] anymore. Since then I didn't work." (AR 245.) When
asked whether he tried to do any other work, Plaintiff testified that

1  he had not, explaining: "Because I cooked.  I would feel good."[5]  (AR

2  248.)  Finally, although Plaintiff evidently told people that he was

3  disabled from *any* work, his physicians did not agree.[6]

4       In the end, Plaintiff's own testimony supplied substantial

5  evidence for Dr. Wiseman's repeated observations that Plaintiff's

6  limitations were, in some measure, self-chosen.  A plausible

7  interpretation of this evidence, and the one that the ALJ ultimately

8  accepted, is that Plaintiff was confusing his desire not to work with

9  an inability to work.  The Court will not overturn this conclusion.

10      3.  International Travel

11      Finally, the ALJ noted that Plaintiff's ability to travel to

12  Venezuela undercut his credibility.  (AR 215.)  Plaintiff claims that

13  this information was not a proper basis for the ALJ's disbelief of his

14  testimony.  (*See* Joint Stip. at 23.)  The Court concludes otherwise.

15      As previously noted, the ALJ is permitted to draw reasonable

16  inferences from the evidence.  *See Sample*, 649 F.2d at 642.  Where, as

17

18  _____

19      [5]  Plaintiff objects that the ALJ's observation that his large
    cash reserve may have affected his motivation to work was
20  "inflammatory conjecture."  (*See* Joint Stip. at 22 (citing AR 215).)
    If not for the other evidence bearing on Plaintiff's motivation, the
21  Court would be inclined to agree that Plaintiff's cash reserve would
    be irrelevant as to *whether* he lacked motivation to work, and only
22  marginally relevant as to *why* he may not have been eager to seek other
    employment.

23
      [6]  Further evidence of Plaintiff's motivation appears in the
24  medical record, when, during an appointment on May 1, 1995--although
    his doctor considered him well enough to return to work the very next
25  day--he stated that he "want[ed] to [return to work at] *end of the
    month*."  (*See* AR 150 (emphasis added).)  The most dismal prognosis was
26  provided by a doctor whom Plaintiff evidently saw while visiting
    relatives in Venezuela in 1997.  (*See* AR 176-77.)  That physician only
27  opined, however, that Plaintiff was "unable to do strong physical
    work."  (AR 177.)
28

1  here, a claimant insists that his impairment causes postural
2  limitations and pain yet takes frequent or very long trips, the ALJ
3  reasonably may infer that his subjective symptom testimony is less
4  than fully credible. *See*, *e.g.*, *Rosario v. Chater*, No. 96-20816 SW,
5  1997 WL 448167, at *3 (N.D. Cal. July 31, 1997)(noting that the ALJ
6  properly considered a claimant's ability to "make plane trips to the
7  Philippines" in finding his claims of disabling back pain to be not
8  credible); *see also Barsotti v. Commissioner, Social Sec. Admin.*, No.
9  99-1089-JO, 2000 WL 328024, at *4 (D. Or. March 13, 2000)(finding that
10  the ALJ properly could find a claimant's pain testimony not credible
11  where, "despite the claimant's allegations of disabling pain, she was
12  able to vacation in Italy for three months").

13      Here, the record shows that Plaintiff claimed to have been unable
14  to walk during the relevant period.  (AR 57.)  Yet he took a trip to
15  Venezuela in 1996 to visit his ailing sister, and remained abroad for
16  more than two months.  (*See* AR 60.)  He disavowed any plans to return
17  to Venezuela, but said that he would return "if an emergency comes
18  up."  (AR 65.)  That Plaintiff was well enough to travel by plane to
19  South America, live, function, and assist his "sick" sister in a
20  developing country for two months, and then return was simply one more
21  piece of evidence upon which the ALJ properly could rely in concluding
22  that Plaintiff's claims of disabling back pain were not credible.[7]

23      In the final analysis, Plaintiff's complaint that the Agency "has
24  failed to cite any part of the record that [Plaintiff] has a

25

26      [7]  In addition, Plaintiff's ability to endure flights from
27  California to Venezuela and back again is inconsistent with his claim
   that he "needs to be able to sit/stand at will." (*See* Joint Stip. at
28  29.)

25

propensity for lying, that he has consistently made representations or that he has exaggerated his report of pain symptoms" begs the question.[8]  (*See* Joint Stip. at 29).  The Agency is not required to accept the testimony of a claimant simply because he has not been caught in an outright lie or observed in the throes of histrionics.  *See Smolen*, 80 F.3d at 1284 (noting that a claimant's reputation for lying is just one of several considerations that may inform an ALJ's credibility findings).  The absence of affirmative evidence that the claimant is malingering means only the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regarding the severity of symptoms.  *See Reddick*, 157 F.3d at 722.  The Court concludes that the reasons the ALJ offered were sufficiently specific, clear, and convincing to support her conclusion that Plaintiff's testimony was not credible.[9]  *See Drouin*, 966 F.2d at 1258.

---

[8]  This argument also is overstated as a factual matter.  More than one person during these proceedings has expressed doubts about Plaintiff's veracity.  At the first hearing, for example, the ALJ chastised Plaintiff for misrepresenting the record and admonished counsel for coaching him.  (*See* AR 70-75.)  In addition, one of the examining physicians specifically characterized Plaintiff as a "suboptimal historian."  (AR 290.)

[9]  A fourth, distinct reason the ALJ offered was her general impression that Plaintiff's testimony about his own capabilities and work history was not reliable, an impression that she supported by adverting to specific examples, e.g., Plaintiff's tendency to overstate the significance of his inability to climb ladders and his tendency to understate his prior work experience.  (*See* AR 215, 218.)  The record supports both of these examples.  (*See* AR 237-38, 245-47, 250-51.)  Although Plaintiff insists that ladder-climbing "was a bona fide requirement" of his prior job, (*see* Joint Stip. at 21), it was *not* a bona fide requirement of *all* of Plaintiff's past relevant work, and was not a requirement of his most recent previous job as an electronics assembler.  (*See* AR 250-51, 255-56, 259-60.)  The ALJ inferred that Plaintiff's continual reference to his inability to climb ladders (*see* AR 237-38, 243) *as though that single limitation*

B.    The Treating Physician's Opinions

Plaintiff next argues that the ALJ did not articulate sufficiently "specific and legitimate reasons for rejecting the opinions of the treating physician." (Joint Stip. at 3.)  After reviewing the medical record, the Court concludes that substantial evidence supports the weight that the ALJ elected to give the treating physician's opinions.

A treating physician's opinion on the nature and severity of an impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).  The ALJ must offer specific and legitimate reasons to reject the opinions of a treating physician. *See Holohan v. Massanari*, 246 F.3d 1195, 1202-03 (9th Cir. 2001); *Lester*, 81 F.3d at 830 (same).  An ALJ need not, however, give controlling weight to the opinion of a treating physician.  *See Batson*, 359 F.3d at 1194-95.  The Social Security regulations make clear that the weight accorded a treating physician's opinion depends on the length of the treatment relationship, the frequency of visits, and the nature and extent of treatment received.  *See* 20 C.F.R. § 404.1527(d)(2)(I), (ii).  "Although a treating physician's opinion generally is afforded the greatest weight in disability cases, it is

*was disabling* was misleading as to importance of ladder-scaling in his previous job and evaded the ALJ in her efforts to establish an understanding of his prior relevant work--a point she subtly made when she charitably lamented the "lack of totally reliable input from" Plaintiff. (*See* AR 218.)  A claimant's appearance of evasiveness at the hearing supplies yet another legitimate ground for an adverse credibility determination.  *See Hardaway v. Chater*, 21 F.Supp.2d 1138, 1147 (C.D. Cal. 1996).

27

not binding on an ALJ with respect to the existence of an impairment
or the ultimate determination of disability." *Tonapetyan v. Halter*,
242 F.3d 1144, 1149 (9th Cir. 2001).

Although a treating physician's opinion may deserve diminished
weight for a multitude of reasons, one particular reason is of
importance here: "A physician's opinion of disability premised to a
large extent upon the claimant's own accounts of his symptoms and
limitations may be disregarded where those complaints have been
properly discounted." *See Morgan*, 169 F.3d at 602 (internal quotation
marks omitted)(quoting *Fair*, 885 F.2d at 605); *see also Barker v. Sec
of Health and Human Servs.*, 882 F.2d 1474, 1477 (9th Cir. 1989)
(finding that the ALJ could reject a doctor's assessment of a
claimant's limitations, where the assessment "apparently came
primarily from [the claimant] himself" and where the claimant's
testimony was found to be not credible).

Plaintiff first saw his treating physician, Dr. Andrea
Nachenberg, in March 1995. That visit consisted of an interview, a
brief physical examination, and a review of a December 1994 x-ray
which showed moderate scoliosis--Dr. Nachenberg diagnosed a "strain"
of Plaintiff's lower back, along with arthritis, and prescribed
Disalcid. (AR 151.) When Plaintiff next saw Dr. Nachenberg two
months later, he told her that the Disalcid had been "very helpful";
she wrote a note authorizing the internist to refill his Disalcid and
stated that he could return to work the very next day. (AR 150.)
More than one year later, in July 1996, Plaintiff returned to Dr.
Nachenberg reporting shoulder and knee problems; this doctor
prescribed medication and an elastic knee support, and told Plaintiff
to follow up as needed. (*See* AR 22.) Plaintiff returned three months

28

later, complaining of a flare-up of his back pain; at that time, he declined physical therapy on the ground that he did not have the money for it.[10]   (AR 24.)   Dr. Nachenberg ordered an x-ray, which showed arthritis and a narrowing of one disc space.   (*See* AR 25.)   After returning from Venezuela, in March 1997, Plaintiff saw Dr. Nachenberg again and sought a refill of Disalcid; a physical examination was normal except for a markedly limited range of motion.   (*See* AR 35.) The doctor recommended that Plaintiff take a water exercise program and discharged him from her care, noting: "Further refills [of Disalcid] should be from internist since no further [follow-up] needed in this dep't if complaint remains only [lower back pain]."   (AR 35.) Plaintiff returned to this doctor eight months later, in November 1997, complaining that another acute episode of low back pain had left him unable to walk; after noting that Plaintiff was ambulatory, Dr. Nachenberg prescribed an increased dosage of the Disalcid and instructed him to get a TENS unit to wear throughout the day.   (*See* AR 12.)

The following month, Dr. Nachenberg wrote a letter in which she summarized the foregoing medical history, and concluded:

> [Plaintiff] continues to state that he is disabled by back pain and he does have positive x-rays indicating that he has degenerative changes of the lumbosacral spine, manifested by arthritis and disk degeneration.   Over the several years that I have followed him, I have not seen any significant

---

[10]   Later that same month, Plaintiff took his two-month-long trip to Venezuela.   (*See* AR 60.)

29

change in his condition and I do not expect him to recover
significantly at this time as compared to his usual status.
(*See* AR 12-13.)  Plaintiff's final visit with Dr. Nachenberg during
the relevant period was in September 1998, when he presented her with
a Social Security form and asked her to complete it.  (AR 314.)  Dr.
Nachenberg agreed and completed the form.  (*See* AR 324-32.)  After
characterizing Plaintiff's spinal disorder, she stated that he could
walk for one block at a time, sit for 10 minutes at a time, and stand
for 30 minutes at a time.  (AR 329.)  She considered Plaintiff able to
stand or walk for about 2 hours during an 8-hour day, and stated that
he could sit for approximately 4 hours during the same period.  (*See*
AR 329.)  Dr. Nachenberg also opined that Plaintiff would need to
change positions at will, would sometimes need to take unscheduled
breaks, and could lift no more than 10 pounds occasionally.  (*See* AR
330.)

Unequivocally, the ALJ "reject[ed] Dr. Nachenberg's favorable
assessments."  (AR 214.)  Although the ALJ acknowledged that Plaintiff
"has had significant restrictions on work functions," she stated that
the treating physician's opinion was faulty in that it "reflect[ed]
merely a rehashing of [Plaintiff's] own statements at various times,"
and then proceeded to explain why she found Plaintiff's subjective
symptom complaints less than credible.  (*See* AR 214-15.)  After
summarizing Plaintiff's medical record, (*see* AR 215-17), the ALJ also
observed that Dr. Nachenberg's ultimate assessment of his limitations
did not "mesh with [her] prior entry releasing [Plaintiff] to work in
May 1995."  (AR 217.)  The ALJ then concluded that she would "reject
Dr. Nachenberg's form responses, at least to the extent that they rule
out [Plaintiff's] capacity for sedentary work" through the date he was

last insured, citing the opinion of a consultative physician: who had
opined that Plaintiff "could sit for a total of six hours a workday,
stand/walk similarly, and could lift/carry ten pounds." (*See* AR 217-
18 (citing AR 280-85).)

It is against this evidentiary backdrop that Plaintiff complains
that the ALJ gave Dr. Nachenberg's opinion--as well as the opinion of
Dr. Wiseman, the testifying physician who supposedly "deferred" to Dr.
Nachenberg--short shrift. (*See* Joint Stip. at 4-5.)  The Court
disagrees.

At the outset, it is important to note what the treating
physician did *not* opine.  Specifically, although Plaintiff repeatedly
told his doctors and other people that he was disabled, (*see* AR 13,
237, 245), Dr. Nachenberg never so opined, although she did assess
functional restrictions. (*See* AR 324-32.)  Instead, she was careful
to note that this was Plaintiff's opinion, and not hers: "*The patient
continues to state that he is disabled* by back pain," and recited the
contents of his two x-rays. (*See* AR 13 (emphasis added).)  The mere
memorialization of a claimant's subjective statements in a medical
report does not elevate those statements to a medical opinion.  *See*
*Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996).

Substantial evidence supports the ALJ's conclusion that Dr.
Nachenberg's opinions were based in large part on Plaintiff's
subjective symptom complaints, which already had been found to be not
credible. (*See* AR 214-14.)  As the above recitation of the medical
record reflects, Plaintiff saw Dr. Nachenberg a total of seven times
over the five-and-one-half-year period from his alleged onset date in
1994, through December 1999.  Although Plaintiff occasionally saw
other physicians during this period, Dr. Nachenberg's impressions and

treatment regimen were derived from what Plaintiff told her about his symptoms, two x-rays, and her in-office visual examinations. (*See* AR 12-13, 24-25.)  When Plaintiff asked Dr. Nachenberg to complete the Social Security questionnaire for him in September 1998, he specifically told her that he "has to sit" after walking one block, claimed that he could sit no longer than 10 minutes at a time, and complained about his medication. (*See* AR 314.)  There is no evidence that Dr. Nachenberg actually observed any of these phenomena, yet she recorded those exact subjective symptom complaints and limitations verbatim when she completed the form two days later. (AR 328-29.) Thus, Plaintiff's contention that the ALJ's finding that Dr. Nachenberg relied on Plaintiff's allegations "could not be further from the truth," (*see* Joint Stip. at 7), is demonstrably overblown and incorrect.

Plaintiff also attempts to distinguish *Fair*, arguing that that case only stands for the principle that "it [is] permissible for the [ALJ] to reject the treating physician's opinions where the opinions are *exclusively based* on the claimant's representations and [those] representations are found to be non-credible." (*See* Joint Stip. at 19 (emphasis added).)  This characterization of what *Fair* held is simply wrong.  Instead, *Fair* held that an ALJ could reject a treating physician's opinion, where it was "premised to a *large extent* upon the claimant's own accounts of his symptoms and limitations" and where the ALJ already had made an adverse credibility determination. *See Fair*, 885 F.2d at 605 (emphasis added); *see also Flaten*, 44 F.3d at 1463-64 (repeating the "large extent" language).  Subsequent opinions have made clear that an ALJ may reject *any* physician's opinion for this reason. *See*, *e.g.*, *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.

32

1  1995)(applying *Fair* to uphold the ALJ's rejection of an examining

2  physician's opinion of disability because the opinion was predicated

3  on the complaints of an incredible claimant).

4      Here, Dr. Nachenberg assessed Plaintiff's functional limitations;

5  although clinical evidence showed that Plaintiff *could* have work-

6  related limitations, Dr. Nachenberg evidently accepted his subjective

7  symptom complaints when she declared *what* those limitations were.

8  (*See* AR 324-32.)  If, as the Ninth Circuit has noted, "a claimant's

9  credibility becomes important at the stage where the ALJ is assessing

10 residual functional capacity," *Tonapetyan*, 242 F.3d at 1147, then it

11 cannot be doubted that a claimant's credibility is equally important

12 when a treating physician purports to give a functional capacity

13 assessment.  Because the ALJ is the final arbiter of a claimant's

14 credibility, *see Sample*, 694 F.2d at 642, she may rely upon her own

15 legitimate reasons for disbelieving a claimant, notwithstanding the

16 credulity of the claimant's own physician.  That is all that occurred

17 here.  (*See* AR 214-15.)

18      Plaintiff suggests, however, that because Dr. Wiseman--the

19 testifying physician--"deferred" to Dr. Nachenberg's opinion, the

20 treating physician's opinion merited an extra measure of deference.

21 (*See* Joint Stip. at 5.)  The Court disagrees.  The gist of Dr.

22 Wiseman's testimony was that, having never examined Plaintiff himself,

23 he was in no position to disagree with Dr. Nachenberg's assumption

24 that Plaintiff's subjective complaints were credible.  (*See* AR 234.)

25 The intuitive appeal of this testimony cannot be gainsaid, but it does

26 not change the fact that, under the regulations, it is the ALJ--and

27 not the treating physician--who is the final arbiter of a claimant's

28 credibility.  This means that, even if Dr. Wiseman had deferred to Dr.

Nachenberg's opinions about Plaintiff's credibility, the fact that substantial evidence supports the ALJ's adverse credibility determination meant that she could reject *any* opinion to the extent that it was based on Plaintiff's subjective complaints. *See Andrews*, 53 F.3d at 1043. Dr. Nachenberg assumed that Plaintiff was credible; Dr. Wiseman evidently accepted Dr. Nachenberg's assumption because he felt he was not in a position to contradict it. Thus, the ALJ's proper credibility findings justified the rejection of *both* opinions, to the extent that those opinions depended upon the assumption that Plaintiff's subjective symptom complaints were credible. (*See* AR 215.)

In sum, and as explained above, the ALJ was free to discount or disregard any doctor's opinion to the extent it was premised on Plaintiff's subjective complaints. *See Morgan*, 169 F.3d at 602; *see also Andrews*, 53 F.3d at 1043; *Fair*, 885 F.2d at 605; *Barker*, 882 F.2d at 1477. The ALJ properly recognized her prerogative when, after her discussion of the reasons why she found Plaintiff's testimony to be less than credible, she added "that any opinion that rehashes his statements is not dispositive of the disability issue." (AR 215.) Because it was for the ALJ--and not the treating or testifying physician--to assess Plaintiff's credibility, and because the ALJ's adverse credibility determination was supported by specific, clear, and convincing reasons, *see Drouin*, 966 F.2d at 1258, the Court finds that the substantial evidence supports the ALJ's decision to reject the treating and testifying physicians' opinions to the extent that both of those doctors took Plaintiff's credibility for granted.

34

C.   <u>Plaintiff's Ability To Return To His Former Job Or Perform Other</u>
     <u>Sedentary Jobs</u>

     Finally, Plaintiff complains that the ALJ erred in determining
that he could, notwithstanding his sedentary residual functional
capacity, return to his prior job as an electronics assembler or work
as a semiconductor assembler.  (*See* Joint Stip. at 30-32, 35-37.)  The
Court need not consider whether Plaintiff met his burden at step four
because it concludes that the Agency met its step-five burden of
proving that he could perform other work.

     If a claimant satisfies his burden of establishing his disability
by demonstrating that he cannot return to his former job or former
type of employment at step four of the sequential analysis, the burden
then shifts to the Agency at step five to show that the claimant can
perform other types of work in the national economy.  *See Pinto v.
Massanari*, 249 F.3d 840, 844 (9th Cir. 2001); *see also* 20 C.F.R.
§§ 404.1520(f), 416.920(f).  The Agency is not required to rely on
vocational expert testimony to meet its burden of proof, however.
Rather, the Agency can satisfy its step-five burden either by (1)
applying the Medical-Vocational Guidelines ("grids"), or (2) taking
testimony of vocational experts.  *See Burkhart v. Bowen*, 856 F.2d
1335, 1340 (9th Cir. 1988).

     Plaintiff was 59 years-old on the date he was last covered for
DIB.  (*See* AR 79, 212.)  He was, therefore, a person of advanced age.
*See* 20 C.F.R. § 404.1563(d).  Plaintiff correctly points out that
where, as here, an ALJ is determining whether claimants aged 55 and
over have transferable skills, she must consider the degree of
vocational adjustment involved in utilizing acquired skills in a new
job.  *See* S.S.R. 82-41.  Transferability of skills to skilled

35

sedentary work for advanced age individuals exists only when there is
"very little, if any, vocational adjustment required in terms of
tools, work processes, work settings, or the industry."  20 C.F.R.
§ 404, Subpt. P, App. 2, § 201.00(f); *see also Renner v. Heckler*, 786
F.2d 1421 (9th Cir. 1986).

     In this case, the ALJ explored the possibility that Plaintiff
could perform other work in the national economy:

Q.  [ALJ]: I'd like to get an indication of other jobs
     that require the same skills that he would have
     acquired that would be transferable to other
     positions.

A.  [Vocational expert]: Okay.  Yeah, I think for that
     we'd probably return a semiconductor assembler,
     very closely related job just dealing with smaller
     items, and that is sedentary, semiskilled.  And
     the *DOT* number on that is 726.684-034.  Nationally
     looking at approximately 100,000 [positions];
     regionally 9,000.

Q.  [ALJ]: And what would be the skills that would
     transfer?

A.  [Vocational expert]: Mostly just the dealing in
     the various assembler tools, assembler products in
     both electronic and subassemblies, components.

Q.  [ALJ]: Okay.  Well, that answers my next question
     because my past hypothetical was going to be if he
     was limited to sedentary work he wouldn't be able

1        to perform the past jobs, but would there be

2        transferable skills for jobs at the sedentary

3        level--

4    A.    [Vocational expert]: Right.

5    Q.    [ALJ]: --and I think you've answered that

6        question.

7    A.    [Vocational expert]: Right.

8  (*See* AR 256-57.)  On the basis of this colloquy, the ALJ concluded

9  that the vocational expert's "testimony establishes that there would

10 be very little vocational adjustment in terms of tools, work

11 processes, work settings or the industry."  (AR 219.)

12     It is against this evidentiary backdrop that Plaintiff argues

13 that "transferability does not exist" between his prior work as an

14 electronics assembler and the job of semiconductor assembler.  (*See*

15 Joint Stip. at 31.)  The Court disagrees.  The regulations provide a

16 guide for determining when transferability is appropriate:

17        Transferability is most probable and meaningful among

18        jobs in which--

19        (I)   The same or a lesser degree of skill is

20              required;

21        (ii)  The same or similar tools and machines

22              are used;

23        (iii) The same or similar raw materials, products,

24              processes, or services are involved.

25 *See* 20 C.F.R. § 404.1569(d)(2).  In this case, substantial evidence

26 supports the ALJ's finding of transferability.  The semiconductor

27

28

assembly job that the vocational expert identified had a *lower* (rather than a higher) specific vocational preparation score than Plaintiff's prior work as an electronics assembler. (*See* AR 258.)  Additionally, and as the foregoing expert testimony reflects, the tools used in the two jobs are similar. (*See* AR 256-57.)  Finally, the vocational expert specifically testified that the "products" involved were transferrable. (*See* AR 257.)

Plaintiff argues, however, that remand is necessary because "the vocational expert never testified that there would be very little or no vocational adjustment." (*See* Joint Stip. at 30.)  The Court rejects the suggestion that the ALJ was required to pose a specific question regarding "vocational adjustment" to the vocational expert. *See Coletta v. Massanari*, 163 F.Supp.2d 1101, 1106 n.10 (N.D. Cal. 2001)(noting that "the ALJ is not required to ask the vocational expert a specific question concerning 'vocational adjustment'"). Although the vocational expert did not testify in so many words that "no vocational adjustment will be necessary" for Plaintiff to work as a semiconductor assembler, his testimony as a whole clearly implied that no vocational adjustment would be required. (*See* AR 256-57.) This implication is reinforced by Plaintiff's own expansive characterization of his skill-set.  At the third hearing, Plaintiff testified that, from 1981 to 1994, he worked as an electronics technician, and stated that it required skill with "everything that's electronic." (*See* AR 251.)  Elsewhere in the record, Plaintiff defined this job as electronic manufacturing. (*See* AR 100.) Consistent with that definition, at the third hearing Plaintiff explained that, during his 13-year tenure at Solid State Electronics, his job was to *make* electronic equipment. (*See* AR 252 ("anything that

38

1    they wanted we'd have to make it").)   Plaintiff's testimony, when
2    combined with the vocational expert's testimony that a person of
3    Plaintiff's skills could segue into the job of semiconductor
4    assembler--which position the expert described as a "very closely
5    related job just dealing with smaller items" (AR 257)--was more than
6    sufficient to permit the ALJ to find that the latter job would require
7    very little vocational adjustment.

8        Accordingly, the Court concludes that the ALJ's explicit step-
9    five determination that Plaintiff's skills as an electronics assembler
10   would be transferrable to work as a semiconductor assembler with "very
11   little vocational adjustment," (AR 219), is supported by substantial
12   evidence.   That being so, the Court need not and does not address
13   Plaintiff's contention that the ALJ erred in her alternate
14   determination that he could return to his prior work as that job was
15   typically performed.

16                                   V.

17                              CONCLUSION

18       For the reasons set forth above, this Court finds that the
19   Agency's findings were supported by substantial evidence and were free
20   from material legal error.   Accordingly, the Court AFFIRMS the
21   decision of the Agency.

22

23       IT IS SO ORDERED.

24       DATED:      June  5 , 2006.

25

26                                   /s/
                                     PATRICK J. WALSH
27                                   UNITED STATES MAGISTRATE JUDGE

28   S:\PJW\Cases-Soc Sec\TOMMASETTI\Memo Opinion.wpd